ESTATE OF THOMAS L. KAPLIN, DECEASED, MAURY I. KAPLIN, EXECUTOR and GERTRUDE F. KAPLIN, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GERTRUDE F. KAPLIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kaplin v. Commissioner
Docket Nos. 16118-79, 16119-79.
United States Tax Court
T.C. Memo 1982-440; 1982 Tax Ct. Memo LEXIS 308; 44 T.C.M. (CCH) 660; T.C.M. (RIA) 82440; August 2, 1982; Reversed and Remanded April 3, 1987 *308 Gerald P. Moran and John G. Mattimoe, for the petitioners. Thomas J. Stalzer, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioners
Year
Deficiency
16118-79
Estate of Thomas L.
1975
$379,255
Kaplin, Deceased, Maury I. Kaplin, Executor and Gertrude F. Kaplin, Surviving Spouse
16119-79
Gertrude F. Kaplin
1976
3,115
The issue for decision is the fair market value of certain stock donated by Gertrude F. Kaplin to the City of Toledo, Ohio, on December 30, 1975. FINDINGS OF FACT Petitioner Gertrude F. Kaplin (hereinafter "Mrs. Kaplin") resided in Toledo, Ohio, at the time of the filing of her petitions herein. Petitioner Maury I. Kaplin, one of the executors of the Estate of Thomas L. Kaplin, Deceased, had a legal residence in Toledo, Ohio, at the time of the filing of the petition in docket number 16118-79. Plaza, Inc. was a corporation formed in 1936 pursuant to the laws of the State of Ohio. The primary business activity of Plaza, Inc. was *309 the operation of an apartment/hotel complex known as The Plaza Hotel, located at 2520 Monroe Street, Toledo, Ohio. Prior to November 14, 1975, Plaza, Inc. had 1059 shares outstanding. On that date, Mrs. Kaplin owned 996 shares of Plaza, Inc., the Estate of Thomas L. Kaplin (Mrs. Kaplin's deceased husband) owned 37 shares and the remaining 26 shares were owned by 11 other persons. In 1975, the Board of Directors of Plaza, Inc., consisted of Maury I. Kaplin (director since 1968), Richard L. Kaplin (director since 1975) and Julian M. Kaplin (director since 1968) -- all sons of Mrs. Kaplin and Thomas L. Kaplin. In 1975 the management of Plaza, Inc. consisted of Richard L. Kaplin (President), Maury I. Kaplin (Treasurer) and Julian M. Kaplin (Secretary). Petitioner Maury I. Kaplin was involved in the management of the affairs of The Plaza Hotel for just under 30 years prior to the end of 1975 and was treasurer of Plaza, Inc. for approximately 20 years. The Plaza Hotel is located in what might be described as a marginal section of Toledo, Ohio, in terms of the average cost of residential and commercial real estate. It sits directly across the street from the city art museum *310 and a church on Monroe Street, a busy thoroughfare. Its other neighbors are a heterogeneous mix of large homes (many converted to multiple-family residences), small commercial buildings, filling stations, and a few one-family homes. The neighborhood is relatively stable, with many elderly residents, but is plagued by a higher than average rate of crime. The Plaza Hotel was a complex of six inter-connected brick buildings built at various times between 1901 and 1930. Facing directly on Monroe Street were buildings four and six, two three-story irregularly shaped buildings of relatively similar appearance containing a total of 57 living units. Many of the units in buildings four and six had become functionally obsolete -- oversized and irregularly shaped apartments no longer considered marketable without substantial alteration. Connecting buildings four and six was a one-story building, building five, built in 1930 and serving as the location of the hotel lobby and coffee shop. Located in this lobby were the hotel front desk, central switchboard and offices. For many years the marquee on the front of building five contained a large blue sign with the words: "The Plaza -- *311 Residential, Transient." Directly behind building number five was building number three, a six-story brick building containing 41 living units. Flanking building number three were two other six-story buildings (these with frame penthouses), buildings one and two. Buildings one and two contained a total of 98 living units. The buildings were all connected by enclosed passageways. Buildings one and three each contained one elevator; building two contained two elevators; buildings four and six had no elevators. Of the 196 living units at The Plaza Hotel, 125 were furnished with carpeting, drapes and curtains, living-room and bedroom furniture and kitchen equipment. In 1975, The Plaza Hotel was, as it advertised, a place where individuals lived either from week-to-week, month-to-month or year-to-year. Its clientele had in recent years tended to include a high percentage of able-bodied elderly residents, mostly retired. During the early 1970s the management of the hotel perceived that profits were declining and that the operation of the hotel was becoming excessively difficult. Both income tax returns and balance sheets of Plaza, Inc. show that as early as 1965, The Plaza *312 Hotel ceased to produce significant profits for its owner and began producing regular, though by no means substantial, losses. Occupancy rates had gradually fallen in the period 1970-1974 to 70 to 75 percent. Rental income began declining precipitously in the fiscal year ending April 30, 1974. The following figures illustrate that decline: Fiscal Year Ending
Rental Income
April 30, 1971
$224,742
April 30, 1972
215,373
April 30, 1973
216,327
April 30, 1974
191,362
April 30, 1975
169,113
Operating expenses were mostly fixed and could not be reduced without changing the character of the hotel. Nevertheless, in an apparent attempt to cut expenses, the Plaza, Inc. progressively spent less and less on maintenance and replacement items. By petitioners' own admission, the Plaza, Inc.'s expenses for these types of items were as follows: 1972
1973
1974
1975
Repairs, Plumbing
$ 886.36
$ 293.48
$ 473.78
$ 304.01
Elevator Maintenance
267.31
1,199.75
1,221.10
836.00
Repairs, Building & Equipment
9,122.76
3,853.99
3,112.41
4,863.10
Furniture & Fixtures
2,583.63
575.75
242.46
233.18
Decorating & Painting
9,013.53
4,911.59
166.44
341.65
Electrical Supplies
765.21
184.54
162.78
155.31
Total
$22,638.80
$11,019.10
$5,378.97
$6,733.25
*313 During the 1970s the management was engaged in an almost continuous battle to keep undesirables -- i.e., drug dealers, alcoholics, etc. -- out of the hotel. In addition, the crime problem of the neighborhood coupled with the largely elderly population of the hotel prompted the management to retain a security guard at night. Maury Kaplin felt that if the Plaza, Inc. had continued to operate the hotel beyond 1975, it would have experienced losses because the management "didn't have the ability to cope with the type of clientele that was coming in there or wanted to come in there." The Kaplins first began trying to sell The Plaza Hotel as early as the late 1960s. Their first proposed buyer was the Toledo Metropolitan Housing Authority ("TMHA"). In 1967, TMHA hired Melvin Mull ("Mull"), an architect, to prepare a feasability study of how The Plaza Hotel property might conceivably be used by TMHA, particularly as housing for the elderly. After a relatively thorough tour of the six buildings, Mull recommended either of two courses of action: 1) demolish all existing buildings and construct 216 new units of elderly housing or 2) demolish buildings three, four, five and six and construct *314 120 new units of elderly housing and rehabilitate buildings one and two to provide an additional 96 remodeled units of elderly housing. Mull projected the cost of the first alternative to be $3,622,500 (which included costs of $135,000 for land purchase and $128,000 for demolition). Mull projected the cost of the second alternative to be $3,018,000 (which included costs of $135,000 for land purchase, $480,000 for "existing bldgs. allowance," $349,000 for remodeling (buildings one and two) and $85,500 for demolition). Since the cost of alternative two was $600,000 lower, Mull recommended the latter option. In neither alternative did Mull recommend the retention of building three, four, five or six. The reason for this was that Mull felt these four buildings were seriously deficient from the perspective of local building and fire codes, standards of the Department of Housing and Urban Development ("HUD") and floor plans usable by the elderly. Mull's instincts as an architect told him that rehabilitation of these buildings would not be economically practical. Despite Mull's recommendations as to the two proposed alternatives' potential costs, he made no estimate of projected *315 TMHA revenues from either alternative. Thus, Mull made no projection that, after spending these large sums of money on The Plaza Hotel site, TMHA would be able to run the new housing complex at a profit. Mull was not an appraiser. His estimates for cost of land and buildings were not derived by any normal method of determining fair market value and in fact were not intended to represent fair market value. The $135,000 he allocated to land and the $480,000 he allocated to existing buildings in alternative two were computed by means of a "forced balance" wherein Mull decided in advance that the cost of remodeling and new construction should not exceed $14,000 per unit of housing, an HUD guideline at the time. After subtracting out from his bottom-line cost figure (roughly $14,000 X 216 units) the determinable costs of demolition, remodeling, construction, landscape and paving and fees, Mull was left with $615,000 which he allocated part to land and part to buildings. This $615,000 figure, therefore, meant that if TMHA could purchase The Plaza Hotel for less than that amount, it could construct elderly housing units at less than the $14,000 per unit HUD guideline. The Kaplins *316 hoped to sell The Plaza Hotel to TMHA by entering into a lease of the hotel to the authority for 10 years after which TMHA could purchase the hotel for $1. Under the lease payments, the Kaplins hoped to realize $1.1 million on the transfer of The Plaza Hotel to TMHA. In 1969, a lease was drawn up, but it was never entered into by TMHA. On July 19, 1972, Plaza, Inc. granted the Kemper American Development Corporation ("Kemper") an option to purchase The Plaza Hotel at a price of $800,000 within four months. Kemper paid $1,000 for this option and another $1,000 on September 19, 1972, for an additional four-month extension of this option. Kemper, however, never exercised the option. Early in 1975, the Kaplins formed the idea of donating The Plaza Hotel and the land it occupied to charity as a means of obtaining at least a substantial tax deduction out of its disposition. They first approached the art museum across the street from the hotel. The art museum, however, did not desire the hotel but expressed an interest in receiving the land cleared of all buildings currently on it for use as an open park space. The Kaplins rejected this idea and proceeded to negotiations with *317 the City of Toledo regarding a gift of the hotel and land to the City. On March 17, 1975, a two-hour site inspection at The Plaza Hotel was performed by Charles Harris and Dick Ehrmin. Ehrmin was formerly an engineer with Sambourne, Stekette, Otis & Evans. The report issued by these individuals is, in substantial part, as follows: 1. The "main" building, a 6 story structure facing Monroe Street [building three] shows internal evidence of settlement. Corridor floors are out of level and stairs particularly are tipped considerably. The 3 story portion facing Monroe & Scottwood [building six] shows structural cracks in brickwork. It would appear the foundations are soft red brick which are deteriorating. This building has an elaborate stamped metal cornice and coping which is badly rusted and will be expensive to replace. The roof does not look too bad. Wood balconies exist which probably are unsafe. 2. The "Robinwood" and "Scottwood" 6 story buildings [buildings one and two, respectively] have parapets between 4 and 5 feet high which are in poor shape, showing settlement and leaning out-of-plumb and obviously unsafe. There are numerous concrete floored balconies *318 supported by heavily rusted and swollen steel brackets and with floors cracked and deteriorated. These appear completely unsafe. Projecting cornice is metal or terra cotta and brackets have been removed leaving unfinished areas. The roofs on these two buildings aren't too bad. Stone at foundations needs tuck pointing. The 3 boilers for the entire complex are in the basement of "Robinwood" 6 story. They were made in 1965, are 15# steam, each of 5.2 million BTUH and appear to be in good condition (on the outside). The brand is "North American". Pipe insulation throughout is beat up, missing and deteriorated. 3. Main lobby and coffee shop ceilings [building five] are discolored, obviously from roof leaks. (The roof is very bad over this area.) Lobby walls are covered with squares of striated plywood some of which are loose and bulging indicating problems behind. 4. The following deficiencies are evident throughout all buildings: A) Peeling exterior paint. Window sash surprisingly do not seem to be excessively rotted as is usual. B) Window screens and doors rusted, holed, askew or missing. There is hardly a decent screen on the place. C) Most stair rails have *319 spindles knocked out. D) Corridor linoleum cracked and worn. E) Some wiring has been extended by use of wire mold and taped-on extension wires. F) Some exit lites are dark or broken. G) Main electric switchgear is composed of bare knife switches and exposed cartridge fuses in a tiny open (not fireproof) room. H) Window shades torn, dirty and/or missing. I) Elevators tiny, rough running, jerky, do not level at floors, beat-up and with broken gates. However, they do have current inspection certificates. J) A few fire hoses exist, some without racks. Such are not painted red or all labeled. Condition of hoses looked at seemed to be adequate. Fire extinguishers looked at had 1975 tags. K) I feel one of the main problems could be fire exits. Adequate or original plans do not exist, so it is not known if secondary egress exists to all 192 apartments. Many halls are narrow, crooked, dark, stairs with inadequate headroom. L) Window sash and doors are loose. A garbage disposal door exists in kitchens, comprised of an inner and outer cast-iron door with space between. These are loose and admit much cold air. M) Almost all exterior concrete walls, porches, *320 curbs, etc., are deteriorated and cracked. N) Much interior paint is peeling, in many cases, caused by its own excessive thickness of many coats. Considerable plaster deterioration exists. O) The interiors of 6 or 7 apartments were seen. The ones which were "cleaned" and ready for occupancy were dirty, with missing or damaged window shades, dirty and deteriorated bathroom tile and fixtures, peeling paint, dirty stove and refrigerator. Just a good wash down of walls ceiling and floors, etc. would help. (It didn't smell too good either.) P) Electrical outlets in apartments were inadequate to meet latest codes. Perhaps this is not necessary, however. Lighting of corridors would appear to be marginal or inadequate. Q) Parking lot appeared to be in quite good shape. R) According to Dave Shapiro, it might be required to install an emergency generator for elevators. S) Basement areas looked at were littered with broken appliances, discarded furniture, rolls of discarded screen wire. Apartments are furnished with cheap, scarred furniture, appliances, worn carpets. Just to clean the place up would require great effort. Windows are difficult to see through. Oak floors *321 should be sanded are [sic] refinished. Almost all of the foregoing is negative. It would appear that it would take as much to rehabilitate this complex as it is worth. However, it is now performing the function of shelter, and could be fixed cheaper and quicker than replacing. It is very marginal as to whether cost of rehabilitation can be justified but perhaps we can't afford to tear it down either. In any event, if it is decided to rehabilitate, it will be very important to spend the money to remedy structural problems. Otherwise, within a very few years it definitely will have to be torn down. On June 25, 1975, the Superintendent of Construction Inspection of the City of Toledo issued a report to Wayman D. Palmer ("Palmer"), Director of Community Development, which read as follows: Regarding the inspection made by the Division of Inspection and Rehabilitation of the above mentioned apartments, we have found the following items that do not comply with the Ohio Building Code. According to the report from our Chief Electrical Inspector, the wiring in the six (6) building complex is totally inadequate for today's standard of living. There are insufficient circuits *322 for the service for each apartment so as to insure adequate protection for safety from possible fire. This complex will have to have the entire electrical system revamped to comply with the Ohio Building Code and The National Electrical Code. The Chief Building Inspector reports these items: Building one, two, and three are six (6) story buildings which have stairwells that are in violation of the Ohio Building Code. Building No. 1 has combustible doors on all the pipe chases, which must be fire rated doors "B" Label. All corridors connecting the buildings must have "B" label doors at the point of connection. Buildings number 4 and 6 are three story buildings. Repairs must be made to plaster in all buildings. The tunnels in the basement area totally violate the Ohio Building Code. Buildings Number 3 and 4, in our opinion, should be demolished. The reason is, these buildings could not be renovated to comply with the Ohio Building Code, short of removing everything but the walls and roof. The inner court yard concrete deck is in a condition of deterioration to constitute a very serious hazard and should be removed immediately. All doors in all buildings are hollow *323 core and have to fire ratings. The elevators must be replaced and all the elevator shafts must be fire rated. The building's plumbing system is in need of major repairs to the piping system and also plumbing fixtures must be replaced and repaired. The water pressure to the fixtures is very poor, indicating the lines are corroded, thereby limiting the water pressure in the lines. The cost to try to convert to Housing for the Elderly would be prohibitive as the code, for this type of occupancy, is more restrictive than conventional apartments. Though numerous instances of violations of building and fire code standards were mentioned in this report, no citation was ever issued to the hotel regarding these violations. In general, under Ohio building codes, old buildings need not be brought up to current building code standards except in cases of safety and sanitation hazards. However, all new construction or renovation must comply with current building code standards. On July 15, 1975, Palmer reported to the city council about the proposed gift and noted that since May 15, 1975, voluntary vacating of The Plaza Hotel in anticipation of the gift to the city had been underway. *324 "To eliminate the prospect of having the City cast in a role of serving as a landlord in a structure which might be code deficient," Palmer stated, "we would recommend that prior to the date for title transfer that all remaining tenants in the complex be relocated." Correspondence by Palmer and minutes of a Toledo City Council meeting on December 9, 1975, show that the city was not sure whether The Plaza Hotel could be feasibly renovated for use as subsidized housing. Continued use of the existing structures was hoped for, but demolition of the buildings was considered a real possibility. The city ultimately decided to accept the buildings in a vacant state and see what could be done with them later. On August 7, 1975, Thomas L. Kaplin died and, thereafter, his son Maury I. Kaplin was appointed executor of his estate. The death of Thomas Kaplin introduced a new element in the proposed donation of The Plaza Hotel to the City of Toledo -- urgency. In their 1975 joint tax return, petitioners Gertrude Kaplin and the Estate of Thomas L. Kaplin reported adjusted gross income of $1,777,056. In her 1976 individual income tax return, Mrs. Kaplin reported adjusted gross income of $96,181. *325 As early as the death of Thomas L. Kaplin, Maury Kaplin realized that tax-wise a gift of the hotel claiming a substantial figure for fair market value would be much more advantageous if made during petitioners' 1975 taxable year than in later years. He communicated this fact to the City of Toledo and the process of making the gift was speeded up. On October 24, 1975, Paul J. Burnor ("Burnor") submitted an appraisal report on The Plaza Hotel to Maury Kaplin. In this appraisal report, Burnor concluded that the fair market value of the land and buildings of the hotel was $750,000. The $750,000 figure was based primarily on the results of a valuation of the property under a projected income approach. Burnor's income valuation was based on a number of assumptions: First, that all units at The Plaza Hotel were habitable and rentable by an "aggressive management;" second, that a vacancy rate of 25 percent (the lowest actual rate since 1971) was achievable; third, that actual expenses at The Plaza Hotel had averaged 70 percent of rental income during the past four years; fourth, that no major expenses for renovation (i.e., other than those provided for normal maintenance) would be *326 necessary to continue to attract tenants; and fifth, that new management would charge currently posted rents at the hotel. Under these assumptions, burnor determined that under new management, yearly rental and other income of the hotel would be $303,675, yearly expenses would be $212,575 (70 percent of the income figure) and yearly profit would be $91,100. Burnor's assumption regarding past yearly expenses at the hotel was erroneous (see above), but was based on information supplied to him by the Kaplins. Burnor also stated in the report that the highest and best use of the buildings would be as a public housing type project * * * principally for elderly types. Buildings four (4) and six (6) * * * have many functionally obsolete characteristics, and it would enhance the area both from an esthetic and a economic [sic] aspect to either remove both buildings or to remove those parts, if possible, which are no longer feasible to operate. Burnor's inspection of the properties was cursory and he failed to note the vast majority of the defects in the six buildings noted by city inspectors. Burnor thought buildings one, two, three and five were basically sound and in overall *327 fair condition. Defects noted in all six buildings were only the following: Windows need painting (buildings two, three, four and six), evidence of water leakage (buildings two, four, five and six), interior needs painting (buildings three, four and six), fallen plaster (building four), concrete flaking (building six) and asphalt tile floors buckling in halls (building six). Burnor did not think there were any code violations in the buildings because he saw no evidence the hotel had been cited for any. Eleven days after receiving Burnor's appraisal report, on November 4, 1975, the management and board of directors of Plaza, Inc. issued an "information statement" to its shareholders. This statement announced that a meeting of shareholders was to be held at which Mrs. Kaplin intended to vote her shares in Plaza, Inc. in favor of a proposed merger. The merger was to be with Plaza Hotel, Inc., a corporation formed on May 1, 1975, pursuant to the laws of the State of Ohio. Mrs. Kaplin was sole shareholder of Plaza Hotel, Inc., having contributed its only asset, $500 in cash. The surviving corporation, to be known as The Plaza, Inc., would be wholly owned by Mrs. Kaplin. Minority *328 shareholders of the prior Plaza, Inc., including the Estate of Thomas L. Kaplin, were to be bought out by the surviving corporation at a price of $800 per share. This $800 per share figure was arrived at, according to the statement, primarily by reference to the Burnor appraisal report. The statement indicated that the reason for the merger was to enable Mrs. Kaplin to give the City of Toledo exclusive ownership of the corporation holding title to the hotel. Under the heading, "Reasons for Merger," the management and directors stated: Plaza's main physical asset is its residental hotel property at 2520 Monroe Street, Toledo, Ohio 43620. In recent years, income from the operations of the hotel, known as The Plaza Hotel, has declined. The hotel is between 50 and 70 years old and operating and maintenance costs continue to rise and almost total renovation of the hotel is necessary to bring it up to building code requirements. Such renovation expense is not, in the opinion of management, justified when projections of future rental income are considered. The cost of renovation has been estimated to be at least $2,000,000. Management believes that continued operation of the hotel *329 will result in continued operating losses. Management has not been able to find a suitable alternative use for the property and efforts to sell the property have not been successful. On November 15, 1975, the proposed merger took place and on December 30, 1975, the City of Toledo accepted all the shares in the successor corporation as a gift from Mrs. Kaplin. At the time of the gift of the stock, the properties owned by the successor corporation included the improvements and land known as The Plaza Hotel and some personal property. Based on data collected on August 18, 1975, on April 2, 1976, the Lucas County, Ohio, tax assessor increased the estimated "true value" of the land and buildings of The Plaza Hotel to $864,300 from a previous valuation of $404,608. Under Ohio law, true value is intended to represent fair market value. The tax assessor's method of determining true value as of April 2, 1976, was by the replacement cost method of valuation, but the reasons he chose particular percentages for normal depreciation and obsolescence are not explained by the county tax records. On February 18, 1976, after a thorough inspection by city building, plumbing, electrical, *330 heating and fire inspectors, John L. Marlais, Assistant Commissioner of Inspection and Rehabilitation of Toledo made the following "summary and recommendation" to Palmer: 1. Demolish Unit #3. The six (6) story structure is a serious hazard not conforming to Code in use, height, construction and mechanical installations. Its demolition must be carefully handled because of the proximity and danger to adjacent buildings. The basement coal bins in the courtyard adjacent to Unit #3 must be demolished because of structural inadequacy. 2. Eliminate penthouses on Units 1 and 2 unless a second means of egress is provided. 3. Provide a completely new Plumbing System, which includes waste and vent lines, water supply and fixtures for kitchens and bathrooms. Because of age, the steam condensate and return lines should be replaced. 4. Provide a completely new Electrical System, which included service, wiring and fixtures and outlets. 5. Install standpipes in stairwells, smoke detectors in corridors and off bedrooms, manual fire alarms and annunciator panel. 6. Enclose all vertical stairwells, elevator and mechanical shafts with fire rated walls and openings. 7. Since *331 area is a continous horizontal flue with vertical shafts opening to all units, it has been fortunate that no serious fire occurred. Fire separations must be installed to prevent the spread of smoke and fire. 8. Replace apartment doors with fire rated doors to corridors as well as to stairways. 9. Weatherseal and insulate all exterior surfaces including roof, brickwalls and windows and doors. Rebuild exterior balconies. In this report, the assistant commissioner estimated that the total cost of rehabilitating buildings one, two, four, five and six and demolishing building three would be $1,453,000. The fair market value of the land occupied by The Plaza Hotel on December 30, 1975, was $154,000. The cost of demolishing all six buildings of The Plaza Hotel on that date was $132,000. A "charette" for planning possible reuses of The Plaza Hotel, short of total demolition, was held by the Toledo Chapter of the American Institute of Architects in May, 1976. Four separate plans for rehabilitation and partial demolition of the hotel complex ultimately emerged from the charette. The cost of the plans ranged from $2 million to $3 million. None of the designs recommended *332 demolition of all six buildings. One design recommended saving only buildings one and two. All designs contemplated the demolition of building three. The architects participating in the charette did not perform economic analyses of the feasibility of these plans, but rather "tried to avoid any preconceptions about cost limits, ownership, and particular use" when they drafted the four proposals. In June, 1977, Palmer reported to the mayor that after the charette, a solicitation to HUD seeking funding for selective demolition, site improvements and/or structural rehabilitation of eligible portions of the buildings was made. The solicitation failed to gain a favorable response. During the summer of 1977 the city placed advertisements regarding The Plaza Hotel in major national newspapers announcing: "Development/Investment Opportunity; Redevelopment Incentives including tax abatement and financial assistance available." In response, the city received five proposals from various developers. The most detailed proposal, made by The Klingbeil Management Group Co. ("Klingbeil") was eventually accepted by the city council on December 13, 1977. At the same time, the council authorized *333 the city manager to negotiate a contract of sale with Klingbeil including a sale price sufficient to recapture the sums of money expended by the city in maintaining the hotel properties during the prior two years -- i.e., about $55,000. On March 21, 1978, the city entered into a contract with Klingbeil to convey the hotel to Klingbeil for a total purchase price of $25,000. A significant provision of the contract required Klingbeil to deliver to the city a letter of credit in the amount of $150,000 which the city could draw on in the event Klingbeil failed to proceed with its plan of renovation and construction and the city was forced to retake the property. This provision was included by the city so that in case Klingbeil defaulted, the city would have funds sufficient to demolish all the buildings standing on the hotel properties. Another provision of the contract barred Klingbeil from reselling the property (other than for purposes of arranging financing) for a period of 10 years. Klingbeil's plans were to create a "self-care elderly housing community" by rehabilitating buildings one, two, four and six and demolishing buildings three and five (which it considered unsound). *334 Klingbeil planned to spend $1.9 million on reconstruction and renovation. Shortly after signing the contract, Klingbeil discovered that while the city had held the hotel vacant, the heating system had seriously deteriorated and now required total replacement. Accordingly, Klingbeil increased its projected renovation costs by $600,000. In July 1978, Klingbeil insured the buildings (except for building three) on The Plaza Hotel property against "fire and additional perils" for $500,000 until actual renovation, alteration and improvements were started. Thereafter, Klingbeil increased its building insurance coverage to $928,012 of June 1, 1979, as it progressively spent money rehabilitating the hotel properties. The $500,000 insurance figure represented roughly 80 percent of the "sound" or "cash" value of the buildings, which the insurance company estimated was approximately $621,000 at the time the policies on the buildings were first written. The sound or cash value used by the insurance company was computed using a replacement cost method of valuation (replacement cost less physical depreciation); and was not intended to represent the fair market value of the buildings insured. *335 On July 3, 1979, building six was heavily damaged by a fire. Up to that time only minimal improvements had been made by Klingbeil to building six. Klingbeil submitted a claim for loss in the amount of $928,012 to the insurance company arising out of damage to building six. Klingbeil also submitted a claim for lost prospective income of $184,817.75 under a separate income insurance policy with the same insurance company. These claims were settled by the insurance company for $600,000. According to Klingbeil's proof of claim for lost income, as of July 3, 1979, Klingbeil expected to receive annual income (beginning in late 1979 and early 1980) from 135 renovated units in the total amount of $368,049. This figure assumed a 95 percent occupancy rate. After the fire, Klingbeil placed national advertisements seeking an alternative developer of the hotel properties. In May, 1980, the Douglas Company paid Klingbeil $100 for a 90-day option to purchase the hotel properties, as is, for $400,000. On their 1975 joint income tax return, petitioners reported a gift of 1,032 shares of Plaza, Inc. to the City of Toledo, Ohio, on December 30, 1975, at a value of $800 per share, or *336 $825,600 total. As a result of this gift, petitioners claimed a charitable deduction of $561,917 on their 1975 return and Mrs. Kaplin claimed a contribution carryover deduction of $14,262 on her individual 1976 income tax return. In separate statutory notices of deficiency, respondent determined that the fair market value of the Plaza, Inc. stock on the date of the gift to the City of Toledo was $22,000 and disallowed the portion of petitioners' charitable deduction exceeding that amount in 1975 (i.e., $539,917) and Mrs. Kaplin's entire charitable contribution carryover in 1976. ULTIMATE FINDING OF FACT The fair market value of the stock in Plaza, Inc. donated by Mrs. Kaplin to the City of Toledo, Ohio, on December 30, 1975, was $22,000. OPINION The sole issue for decision is the fair market value of the stock in Plaza, Inc. donated by Mrs. Kaplin to the City of Toledo, Ohio, on December 30, 1975. On brief, petitioners argue that all of the following evidence, taken together, supports a holding that the fair market value of the donated Plaza, Inc. stock on December 30, 1975, was "not less than $600,000 nor more than $700,000:" [1]
*337 1) the 1967 Mull report which allocated $480,000 to existing buildings and $135,000 to land at The Plaza Hotel, 2) the proposed 1969 lease to TMHA which would ultimately have resulted in a sale of the hotel to TMHA for $1.1 million, 3) an alleged 1971 offer to purchase the hotel for $450,000 which petitioners rejected as too low, 4) the 1972 option to Kemper to purchase the hotel for $800,000, 5) the $750,000 valuation by the Burnor report of the land and buildings in 1975, 6) the Lucas County tax valuation of the hotel at $404,608 prior to April 2, 1976, and $864,300 thereafter, 7) the $800 per share paid to buy out the minority interests in the Plaza, Inc. in 1975, 8) the fact that Klingbeil was willing to spend $1.9 million to renovate and reconstruct the hotel properties, 9) testimony at trial by Palmer that the hotel and its land were worth $700,000 at the time of the gift, 10) Klingbeil's $600,000 insurance settlement as a result of the 1979 fire in building six, and 11) a 1980 option to the Douglas Company to purchase the partially renovated hotel properties from Klingbeil for $400,000. Respondent, on the other hand argues the following evidence, taken *338 together, supports a holding that the fair market value of the donated Plaza, Inc. stock on December 30, 1975, was $22,000 -- i.e., the value of the land on which the hotel stood ($154,000) less the cost of demolishing all structures on that land ($132,000): [2]
1) the run-down condition of the hotel properties at the time of the gift, 2) the continued operating losses of the hotel in the years immediately prior to the gift and management's prediction of continued operating losses in the absence of renovations costing at least $2 million, 3) the refusal of the art museum to accept the hotel as a gift, 4) the sale of the properties by the city to Klingbeil in 1978 for $25,000, and 5) the report of respondent's expert appraiser, Brent Biggs ("Biggs"), that the fair market value of the properties was $22,000 on December 30, 1975. In evaluating the evidence presented by the parties, three important concessions by petitioners should be noted: First, petitioners concede that a replacement *339 cost valuation approach is not a reliable measure of fair market value in the case of such old and highly deteriorated property as The Plaza Hotel. See . [3] We think this concession completely undermines any reliance petitioners place on both the tax assessment and insurance proceeds figures (petitioners' points 6 and 10, above) which admittedly were based on replacement cost calculations. Second, petitioners concede that building three would have to be demolished by any purchaser of the hotel properties on December 30, 1975, and that the cost of the demolition of this building alone would be $24,000. Third, petitioners concede that the actual cost figures for The Plaza Hotel's operations in the early 1970s used by Burnor in his appraisal report were erroneous in that they omitted substantial expenses. Perhaps the best way for us to explain how we arrived at our ultimate finding of fact is by a process of elimination of the evidence we find lacking in substantial probative value. We do not find the 1967 Mull *340 report (petitioners' point 1), with its allocation of $480,000 to buildings, $135,000 to land and $85,000 to demolition, convincing. At the trial of this case, Mull testified that these numbers did not represent his estimate of fair market value, but were instead the product of a "forced balance" to bring his remodeling and construction cost projections within a currently-used HUD guideline. Next, we do not find much relevance in the options to purchase the hotel both before and after the gift to the city (petitioners' points 4 and 11). Neither of these options was exercised prior to the time of trial and only nominal amounts of money were spent in their acquisition. The most we can say is that these options established an offering price for the properties at the time they were issued. In addition, we think the 1980 option both too distant in time and in underlying circumstances to merit consideration. For the same reason we did not find the options to sell relevant, we also did not find Plaza, Inc.'s proposed lease of the hotel properties to TMHA in 1969 to be of much relevance (petitioners' point 2). The lease was never consumated and there is no indication that TMHA ever *341 seriously considered paying such a high price for the properties. All the proposed lease establishes is that Plaza, Inc. was willing to part with the hotel at that price in 1969. The fact that Klingbeil was willing to spend $1.9 million to renovate most of the buildings (i.e., buildings one, two, four and six) also sheds little light on the fair market value of the hotel properties (petitioners' point 8). Nowhere in the documents produced by petitioners does Klingbeil estimate the value of the existing land and buildings or project a future income stream therefrom. Palmer's testimony that the hotel properties had a value of $700,000 was, according to his own statement, not an estimate of fair market value as of December 30, 1975, but was rather an estimate based in terms of the conditions of what the buildings could be in the future. This testimony (petitioners' point 9) was therefore both speculative and not probative of the issue at hand. Finally, the fact that Plaza, Inc. bought out its minority shareholders at $800 per share is also of marginal relevance (petitioners' point 7). The $800 per share figure was determined with reference to the Burnor valuation report and *342 has little independent significance. (It should be noted, too, that because of Mrs. Kaplin's large stock interest any inflation in value created by the Burnor report would save petitioners more through a larger charitable tax deduction than it would cost in terms of larger payments to minority shareholders.) A highly relevant figure, if it were true, would be an alleged offer to purchase The Plaza Hotel in 1971 for $450,000 made by one Dr. Schachner, which petitioners claimed to have turned down as inadequate (petitioners' point 3). The only evidence of this offer was the testimony of Maury Kaplin; no corroborating documentary evidence was produced. Based on our evaluation of the credibility of Maury Kaplin, particularly his evasive answers and convenient lapses of memory on other topics on cross-examination, we are not persuaded that this offer was ever made. Petitioners' remaining point of support for their valuation is the Burnor report (petitioners' point 5). We have carefully weighed and examined this document and Burnor's testimony in support thereof. In our opinion, however, the report is so flawed and inaccurate as to be totally worthless in determining fair market *343 value. First, the Burnor report was based on a rather cursory inspection of The Plaza Hotel. Though city inspectors and other independent inspectors in 1967, 1975 and 1976 noted numerous structural, plumbing, electrical, heating and fire-prevention defects in the hotel, Burnor for the most part only noted that the buildings needed painting and plastering. This error in perception was incorporated into the income valuation of the Burnor report which includes no provision of funds for rehabilitation and renovation of the existing hotel buildings. Burnor's income analysis only assumes continued maintenance expenses at levels based on the clearly inadequate 1972-1975 actual maintenance expenses. Even allowing for increasing these expenses proportionately for projected increased rents (as Burnor does), we think this maintenance expenses assumption patently contrived. In particular, we note that the Kaplins themselves, only 11 days after the Burnor report was issued, stated that $2 million in renovation expenses would be necessary on the hotel and that continued operation of the hotel without renovation would result in continued operating losses. Second, Burnor's report assumed *344 that expenses at the hotel had been running at 70 percent of gross income and would continue at that rate under new, "aggressive" management. In fact, Burnor was misinformed about the true expenses at The Plaza Hotel from 1972-1975; in those years the expenses had actually begun to exceed income. Burnor's assumption that more aggressive management could prevent losses also seems highly questionable in light of the fact that maintenance expenditures were already at minimal levels by the mid-1970s. Petitioners argue that they ran the hotel as a hobby and did not try to make as much money as they could have if they operated the hotel as a residence for drug addicts, alcoholics, etc. How this more "aggressive" use of the property by a "slum landlord" (petitioners' words) would produce more net income, however, was not explained. Indeed, in a rather contradictory passage, Burnor himself states that the highest and best use of the property would not be to run the hotel as a haven for drug trafficers but as a "public housing type project * * * for elderly types." (At trial, though, Burnor admitted, "I don't know a thing about public housing.") Third, though Burnor recommended demolition *345 of buildings four and six and petitioners now concede that building three had to be demolished, Burnor's report includes projected income from rental of all 196 units (adjusted by a vacancy rate) in existence prior to the gift.Burnor's income analysis thus assumes a buyer would pay for the right to receive income from buildings that should be torn down -- a clearly erroneous assumption. Based on the above errors going to the heart of Burnor's income valuation analysis and the fact that both Burnor and petitioners concede that an income valuation analysis is the correct analysis to apply to the subject property, we reject the Burnor report's conclusions intoto.
By the same token, certain of respondent's evidence is only tangentially probative. In particular, the fact that the city sold the property to Klingbeil for $25,000 does not prove fair market value since the city instructed its negotiators only to seek the recovery of the city's out-of-pocket carrying expenses of the hotel ($55,000). Second, the fact that the art museum did not want the property, even as a gift, may have had more to do with the fact that the meseum did not want to get into the hotel business *346 or, alternatively, to incur demolition and other expenses necessary to make the property into a park, than with the museum's opinion of the property's value. There is no evidence that the museum ever was fully apprised of the details of the hotel's operations, income and expenses -- i.e., that it was in the position of a knowledgeable purchaser. Not even respondent argues that the property was entirely worthless. What we do find to be highly relevant, however, are two documents: the valuation report prepared by respondent's expert, Brent Biggs ("Biggs") and the "information statement" to shareholders prepared by the Plaza, Inc. management, dated November 4, 1975. The latter document reveals that The Plaza Hotel had been losing money in the years immediately preceding the years before the Court, and would need $2 million of rehabilitation to bring it up to code standards. Management felt the substantial investment was not economically justifiable, but, absent rehabilitation, anticipated that continued operating losses would occur. This document tends to corroborate various other descriptions of the badly deteriorated physical condition of the hotel and the estimates of cost *347 of bringing the buildings up to Toledo code standards made by third parties (other than Burnor). In its income analysis, the Biggs report assumes an investment of $1,453,000 would be necessary to bring the hotel up to Toledo standards (after demolition of building three and the fire-hazard penthouses on buildings one and two). This is a most conservative estimate of rehabilitation costs, taken from the City of Toledo's own figures, and is well below estimates made by petitioners ($2 million), Klingbeil ($1.9 million, initially) and the charette architects ($2 million to $3 million). Biggs further assumes that the best use of the hotel properties would be as rental units for low-income families and the elderly which would be eligible for rental subsidies under section 8 of the Housing Act of 1974. Using section 8 rents prevailing in Toledo for early 1976, Biggs calculated a potential gross annual rent of $291,528. Assuming a three percent vacancy rate (highly optimistic) and capitalizing the effective gross annual rental, Biggs concluded that the refurbished property would be worth $1,557,000. After subtracting from this last figure the cost of refurbishing, interest and rent-up *348 expenses, Biggs concluded that the economic value of the hotel properties in the condition they were in on December 30, 1975 was $22,000. Petitioners raise only two objections to Biggs' income analysis valuation, neither of which we find convincing. First, petitioners argue that Biggs incorrectly assumed that rehabilitation expenditures were necessary to bring the hotel up to building and fire codes. Petitioners contend that 1975 building and fire codes did not apply to The Plaza Hotel, except in cases of hazards to health and safety, and that therefore rehabilitation and renovation would not be required by a new owner. While petitioners' analysis of the state and local building and fire codes may be correct, petitioners have simply failed to show that continued operation of the hotel without substantial renovation would be profitable. Any new renovation, according to the building and fire codes, would have to comply with the current codes. Biggs' inclusion of $1,453,000 for such renovation in his income analysis therefore was reasonable and in light of the testimony previously alluded to, possibly an error on the conservative side. Petitioners' second argument is that Biggs *349 used the wrong rental income figures for "section 8 housing" in Toledo in early 1976. However, we find no evidence in the record that would suggest Biggs' figures were incorrect. [4]
Consequently, we accept *350 Biggs' income valuation analysis and hold that the fair market value of The Plaza Hotel properties was $22,000 as of December 30, 1975. As a final matter petitioners contend that Plaza, Inc. owned at the time of the gift to the city not only The Plaza Hotel, but substantial amounts of personal property -- i.e., furniture and appliances. In the petition in docket no. 16118-79, petitioners argue that this personal property itself was worth $75,000. Other than the highly speculative testimony of Maury Kaplin and Burnor, individuals not familiar with selling such used items of personal property, there is no evidence to support a conclusion that this property had any value on December 30, 1975. We note that in 1975, another inspector described these items as "cheap, scarred furniture, appliances, worn carpets." On this record, petitioners have failed to show that a purchaser on December 30, 1975, would ascribe any value to such items. Consequently, we hold that the fair market value of the Plaza, Inc. stock donated to Toledo on December 30, 1975, was $22,000. Decisions will be entered for the respondent.
Footnotes
1. It may be noted that this range of value represents a substantial reduction from the $825,600 value reported by petitioners on their 1975 joint income tax return.↩
2. Petitioners concede the correctness of respondent's land value and demolition cost estimates.↩
3. See also .↩
4. Petitioners were apparently confused by Klingbeil's proposal to the City of Toledo in 1977 which inferentially suggests that Klingbeil planned to charge rents of $323 per unit for its 138 renovated apartments -- well above the section 8 program figures used by Biggs. However, it appears from Klingbeil's proof of claim after the 1979 fire that late 1979-early 1980 rents for one bedroom apartments were to be at $230 per month and the total projected annual rent was to be $368,049 at that time. This last figure contrasts with the $535,000 annual rent figure in 1978 calculated by petitioners using the $323 per month figure. Biggs figure was $282,782 of annual rental income in early 1976 -- a figure much closer to the actual Klingbeil projected figure when almost four years of inflation is taken into consideration. In addition, there is no evidence that Klingbeil was expecting all or even some of its renovated apartments to be eligible for section 8 rental subsidies.↩